# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| A Samsung cellular phone, IMEI 354268112043190; and a OnePlus Model HD1913 cellular phone, IMEI 866016042029636 | )  Case No. 2:21-mj-5080 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute controlled substances |
| 21 U.S.C. § 846 | Conspiracy and attempt to distribute controlled substances |
| 18 U.S.C. § 922(g) | Felon in possession of firearm and ammunition |
| 18 U.S.C. § 924(c) | Possession of firearm in furtherance of a drug trafficking crime |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/  James Chung
_____
*Applicant's  signature*

James Chung, Special Agent, ATF
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's  signature*

City and state: Los Angeles, California_____     Honorable Patricia Donahue, U.S. Magistrate Judge
                                                    _____
                                                    *Printed name and title*

AUSA: Jeremiah Levine x8323

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on September 30, 2020, and currently maintained in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives in Glendale, California:

1.   A Samsung cellular phone, IMEI 354268112043190; and

2.   A OnePlus Model HD1913 cellular phone, IMEI 866016042029636.

13

**ATTACHMENT B**

**I. ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances); 18 U.S.C. §§ 922(g) (prohibited person in possession of firearm and ammunition) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), namely:

    a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

    b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

    c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written

communications sent to or received from any digital device and which relate to the above-named violations;

        d.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition were bought, sold, or otherwise distributed;

        e.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, guns, or ammunition;

        f.   Contents of any calendar or date book;

        g.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

        h.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

        i.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

        j.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

15

k.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

l.    evidence of the attachment of other devices;

m.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

n.    evidence of the times the device was used;

o.    passwords, encryption keys, and other access devices that may be necessary to access the device;

p.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

q.    records of or information about Internet Protocol addresses used by the device;

r.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

**II. SEARCH PROCEDURE FOR THE SUBJECT DEVICES**

　　3.  In searching the SUBJECT DEVICES (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

　　　　a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") may
search any SUBJECT DEVICE capable of being used to facilitate
the above-listed violations or containing data falling within
the scope of the items to be seized.

　　　　b.   The search team will, in its discretion, either
search each SUBJECT DEVICE where it is currently located or
transport it to an appropriate law enforcement laboratory or
similar facility to be searched at that location.

　　　　c.   The search team shall complete the search of the
SUBJECT DEVICES as soon as is practicable but not to exceed 120
days from the date of issuance of the warrant.  The government
will not search the digital device(s) beyond this 120-day period
without obtaining an extension of time order from the Court.

　　　　d.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

　　　　e.   The search team may subject all of the data
contained in each SUBJECT DEVICE capable of containing any of
the items to be seized to the search protocols to determine
whether the SUBJECT DEVICE and any data thereon falls within the

17

scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

f.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

g.   The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

h.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

i.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return that SUBJECT DEVICE and delete or destroy all forensic copies thereof.

j.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

k.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the

18

government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

l.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

m.    After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

n.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other

court order.

**AFFIDAVIT**

I, James Chung, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to search two digital devices: a Samsung cellular phone, IMEI 354268112043190; and a OnePlus Model HD1913 cellular phone, IMEI 866016042029636 (collectively, the "SUBJECT DEVICES"), described in Attachment A, for the items to be seized described in Attachment B.

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances); 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated

1

otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    I am a Special Agent with the United States Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  I have been an ATF Special Agent since July 2020.  I am currently assigned to the Glendale I Field Office in the Los Angeles Field Division of ATF, which conducts investigations into violations of federal firearms, explosives, and narcotics laws.

5.    As a part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF at the Federal Law Enforcement Training Center in Glynco, Georgia, for approximately 26 weeks.  This training included instructions on federal and state firearms and narcotics laws and regulations.

6.    I have participated in investigations involving violations of federal statutes governing firearms, explosives, and narcotics.  I have also participated in investigating violations of state firearms and narcotics laws.  I have assisted in the execution of state and federal search warrants. I have also conducted surveillance of individuals committing crimes of violence, individuals trafficking in firearms, individuals trafficking illegal narcotic substances, prohibited persons in possession of firearms, and persons possessing illegal firearms.  I have also interviewed confidential informants, cooperating witnesses, criminal defendants, and

2

other persons engaged in violations of federal firearms,
robbery, explosives, and narcotics laws.  Prior to my employment
with the ATF, I was a Probation Officer with the New York City
Department of Probation for two years.

### III.  SUMMARY OF PROBABLE CAUSE

7.    On September 30, 2020, California Highway Patrol
("CHP") Officer Carlos Medina saw Taron AGAZARYAN drive a motor
vehicle through a red traffic light in North Hollywood,
California.  Officer Medina and his partner conducted a vehicle
stop, which subsequently led to the arrest of AGAZARYAN.  Upon
searching the vehicle AGAZARYAN was driving, law enforcement
officers found three firearms (two pistols and one AR-15 type
lower receiver with a detached AR-15 type upper receiver), live
rounds of 9mm ammunition, a substance later determined to be
methamphetamine, a substance later determined to be heroin, a
variety of pills marked to look like prescription medication, a
digital scale, $40,909, and the SUBJECT DEVICES.  AGAZARYAN has
two felony convictions.

### IV. STATEMENT OF PROBABLE CAUSE

8.    Based on my review of law enforcement reports, CHP
dashcam video, conversations with Officer Medina and ATF Agent
Jason Van Bennekum, and my own knowledge of the investigation, I
am aware of the following:

**A.   Law Enforcement Finds AGAZARYAN in Possession of Firearms and Narcotics**

9.    I know the following based on my review of CHP reports, CHP dashcam video, conversations with CHP Officer Medina, and my review of drug test reports:

a.    On September 30, 2020, at about 12:45 A.M., CHP Officer Medina observed AGAZARYAN drive an Aston Martin through a red traffic light in North Hollywood, California.  Officer Medina and his partner and passenger, CHP Officer Stuart Ulvin, made a traffic stop of AGAZARYAN.  During the traffic stop, Officer Medina initially spoke to AGAZARYAN through the Aston Martin's driver's-side window.  As Officer Medina and AGAZARYAN spoke, Officer Medina observed AGAZARYAN making exaggerated movements, smelled the odor of burnt and fresh marijuana, and saw a digital scale on the center console of the vehicle. Officer Medina told AGAZARYAN to exit the vehicle and detained him in handcuffs on the side of the road.

b.    While AGAZARYAN was detained, CHP Officer Ulvin picked up AGAZARYAN's wallet from the top of the Aston Martin, where AGAZARYAN had left it.  Officer Ulvin noticed a California Driver's license inside the wallet that was obviously fake. Officer Ulvin conducted a record check of the driver's license number, and the number returned to a female with different descriptors than AGAZARYAN, who is male.  Officer Medina then told AGAZARYAN that he was under arrest for possession of a fraudulent California Driver's license.

4

c.   Once AGAZARYAN was arrested, officers searched the Aston Martin.  They discovered:

i.   20 live rounds of 9mm ammunition;

ii.  A Kimber model 1911 .45 caliber handgun with a magazine inserted;

iii. A Girsan model MC 1911C .45 caliber semiautomatic pistol;

iv.  An AR-15 type .223 caliber semiautomatic pistol;

v.   Approximately 1.022 kilograms of what was later determined to be a mixture and substance containing methamphetamine;

vi.  Approximately 638.1 grams of what was later determined to be heroin;

vii. Approximately 10.3 grams of mushroom-like substance which later tested positive psilocyn and/or psilocybin;

viii.    A container with 27.9 grams of marijuana;

ix.  85 tablets with physical markings indicating amphetamine, 4 sublingual films with physical markings indicating buprenorphine, 31 tablets with physical markings indicating oxycodone, 10 tablets with physical markings indicating alprazolam, 110 tablets with physical markings indicating tadalafil, 76 tablets with physical markings indicating sildenafil, 12 items with a total gross weight of

approximately 227.4 grams with physical markings indicating alprazolam;

        x.  a digital scale;

        xi.  $40,909 in cash;

        xii. Another California Driver's License; and

        xiii.    The SUBJECT DEVICES.

       d.  AGAZARYAN has not requested return of the foregoing property.

**B.  AGAZARYAN is a Felon**

10.  I reviewed certified conviction documents for AGAZARYAN and learned that AGAZARYAN has previously been convicted of the following crimes punishable by a term of imprisonment exceeding one year:

       a.  On or about November 16, 2018, AGAZARYAN was convicted of a violation of California Health and Safety Code Section 11378, Possession for Sale of a Controlled Substance, in the Superior Court of California, County of Los Angeles, Case Number LA089152; and

       b.  On or about July 19, 2019, AGAZARYAN was convicted of a violation of California Health and Safety Code Section 11378, Possession for Sale of a Controlled Substance, in the Superior Court of California, County of Los Angeles, Case Number LA089753.

**C.  Interstate Nexus Determination**

11.  I reviewed a report by ATF Special Agent David Hamilton stating that the Girsan and Kimber firearms, and the

ammunition found in the Aston Martin, all traveled in interstate or foreign commerce.

### V.  **TRAINING AND EXPERIENCE ON DRUG OFFENSES**

12.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In

addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

13.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

        a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual

who is supplying firearms for future purchases or referrals.
Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell
their firearms and purchase firearms.  Correspondence between
persons buying and selling firearms often occurs over phone
calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that they sell or offer for sale.

d.   Individuals engaged in the illegal purchase or
sale of firearms and other contraband often use multiple digital
devices.

VII. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

14.  As used herein, the term "digital device" includes the
SUBJECT DEVICES.

15.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

9

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

16.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

11

17.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.       **CONCLUSION**

18.   For all of the reasons described above, there is probable cause to believe that AGAZARYAN has committed violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances); 18 U.S.C. §§ 922(g) (prohibited person in possession of firearm and ammunition) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime).   There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
_____, 2021.

_____
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE